Your Honor, the second case on the docket this morning is 2-24-0217, Mark A. Blanquart, plaintiff's appellant, v. Dr. George N. Kalayil, M.D., individually, and who mentions Psychiatry and Counseling, P.C., Defendant's affiliates, arguing on behalf of the appellant, Mr. Edward S. Guero, arguing on behalf of the affiliate, George N. Kalayil, Mr. Daniel P. Craig, arguing on behalf of the appellee, Convention of Psychiatry and Counseling, P.C., Mr. Thomas P. Blanquart. All right, counsel, you may begin when ready. Please feel free to adjust the microphone. Thank you, Your Honor. Good morning, Your Honors. My name is Edward Guero. On behalf of the plaintiff, Mark Blanquart, I'd like to do a brief recitation of the pertinent facts. It will be quite brief. On March 18, 2013, the plaintiff was admitted to Mercy Hospital in Aurora, Illinois, and treated there for self-inflicted wounds. He was stabilized and then transferred to Mercy Behavioral Health Service. The plaintiff came under the care of psychiatrist Dr. Gonkar on March 18, the same day. Dr. Gankar provided some initial treatment orders, one of which was to reduce the patient's Xanax prescriptions from 8 mg a day to 6 mg. He admitted the patient to the Behavioral Health Service from the emergency room, and Dr. Gankar then transferred the patient's care to his practice partner, Dr. Khalil, for some further admission orders. It should be noted that Drs. Gankar and Khalil are practice partners in the same practice group called Convention of Psychiatry and Counseling. Dr. Gankar is, in fact, the owner and president of that company. Dr. Khalil, this would be later in the afternoon, on March 18, Dr. Khalil provided some further admission orders, including elimination of the patient's Xanax medication. Dr. Gankar placed the patient on what's called a detoxification treatment plan using the CEWA protocol for alcohol withdrawal. CEWA is an acronym, and it stands for Clinical Institute Withdrawal Assessment for Alcohol Withdrawal. Did Dr. Khalil see him at that point, physically? No. Did he ever see him? No, he did not. Okay. Dr. Khalil, after he provided those initial treatment orders, then transferred the care back to Dr. Gankar, and Dr. Gankar began seeing the patient, I believe it was around 9 in the morning the next day on March 19, all the way through discharge on March 22. From March 19 through March 22, Dr. Gankar kept Dr. Khalil's treatment orders in place without deviation. He didn't have to do that, though. No, he didn't have to. I mean, he saw him physically. He could have changed the orders, correct? Of course he could have changed those orders. As we'll discuss in a minute, that is not the most important fact, or it's not even a relevant fact under foreseeability analysis, but I'll get to that in a moment. And the doctor who treated, and how are you saying his name? I say it Dr. Gankar. I just say Dr. G, that's how I'm going to interrupt. This doctor did take a full history, whereas I don't believe Dr. K, and that's again my inability to say those names, did take a total history with all of the information that normally happens upon admission to the hospital, right? That would be correct. Dr. Gankar did take a history, and Dr. Khalil did not. And in that total history, there should have been, and there was, evidence or information about what medications he took before he stepped foot in Mercy, correct? Yes, but if I could just step back a minute. All that information was very available to Dr. Khalil as well. He just chose not to view those documents. Well, I guess then the issue is, what was Dr. Khalil, what was his job? Was it to evaluate the patient or follow up from what happened in the emergency room, and then that geriatric area that they had him in because they didn't have a bed, I guess, in the behavioral health, until, you know, what was his, was his job to just get him into the right place, or was it to actually treat him? Well, I, based on the medical records and Dr. Khalil's testimony and his deposition, he was to evaluate the individual relative to detoxification orders. Dr. Gankar the next day did a full psychiatric battery, so they treated the same patient according to different tasks, jointly treated him. And how did they determine the blood alcohol content? Well, that was done, I believe, at the emergency room early on. By a blood test? By, yeah, by a blood test. I believe that was done around 2 in the morning on March 18th. First came to Dr. Gankar, I think around 9 or 10 in the morning. Okay, so continuing, but I think we're there, basically. On March 22nd, the plaintiff was discharged from Mercy without benzodiazepines because, in Dr. Gankar's words, the patient was not withdrawing. And on March 23rd at 10 a.m. approximately, the plaintiff suffered a grand mal seizure caused by a benzodiazepine withdrawal. The court below found no proximate cause between Dr. Khalil and the plaintiff's injuries. The court found that Dr. Gankar was the sole proximate cause of plaintiff's injuries, and the court dismissed the case on defendant's summary judgment, and this appeal followed. So I'd like to discuss, may I? I think we should have done this beforehand. I'd like to first discuss the issue of proximate cause specifically, the foreseeability of third party conduct in proximate cause analysis. The rule in this case is, the applicable rule is third party conduct does not break the chain of causation between the defendant's negligence and the plaintiff's injury, so long as the third party's conduct is probable and foreseeable. I'm relying on the Coons case, that's heavily relied on in this case. The Coons factors are this, a third party physician's conduct is foreseeable when a physician provides negligent written orders for a patient, transfers the patient for treatment to another physician, the second physician treats the patient in conformity with the negligent orders, and the patient is injured. If those factors are present, the second physician's conduct is foreseeable. The Coons factors are present in this case, Your Honors. So who is the second party? The second physician in this case would be Dr. Gonka. And he settled? He received the orders from Dr. Khalil. Let's go back. He settled with the defendant, correct? Or with the plaintiff? Correct. I'm sorry, I didn't hear that. The Coons factors are present here. Dr. Khalil provided negligent treatment orders on March 18, 2013, sent these transfer orders of care to Dr. Gonka. The record in Dr. Gonka's deposition states, statements show Dr. Gonka treated the patient using Dr. Khalil's treatment plan. The record in Dr. Gonka's deposition statements show Dr. Gonka discharged the patient in conformity with Dr. Khalil's treatment plan. That's the CEVO protocol. But by the time the initial order was to undergo that protocol, the initial CC something, and the question I have is, is there any testimony at all about the interaction of Xanax and that procedure that would red light the fact that he should be discharged? He should not be on Xanax when he is going through that procedure. Well, yeah, there is actually testimony on that. Dr. Khalil has stated that Xanax is not part of the CEVO protocol. Okay, but is there anything, that I know, but is there anything dangerous about, it's not part of the protocol, but is there anything that would hurt the plaintiff if he were both taking as much Xanax as he should be taking, or as he was taking, and going through the protocol? And I don't think there's anything about that, is there? Well, according to Dr. Goldberg, basically he was treated incorrectly by putting him on the CEVO protocol. His problem was not alcohol withdrawal, his problem was benzodiazepine withdrawal, and both physicians should have seen that right off the bat, because it's clear in the history, the intake notes from the ER physicians, that he had a prior seizure, and he was on a long-term, high-dose Xanax prescription for years. Was that Xanax prescription due to seizures, or due to anxiety as a result of addiction? Due to anxiety, a serious anxiety problem he had. He was seeing a psychiatrist, Dr. Raven, I believe, for many years prior. But he wasn't getting that for seizure-related issues?  Okay. No, no. He did have a prior seizure. This also was in the history, it should have red-lighted the issue for the doctors. He did have a prior seizure, I believe it was October 19th of 2012. He decided, he was released from Google, or released from Motorola, because Google bought Motorola. He went into a state of depression and said, I wanted to clear my life up, I want to get off all my drugs. He stopped everything right away. He had a seizure like two or three weeks later after that stopping. The doctor, I believe it was Dr. Patel, from Bolingbroke Hospital, stated that even though there was a three-week hiatus between stopping the Xanax and him having the seizure, basically it was due to stopping the Xanax. And Dr. Goldberg, our plaintiff's expert, states that the seizures can come on because the symptomology from benzodiazepine seizure can be latent, and it's not similar to alcohol withdrawal. You can have a cessation or a reduction in the dosage of Xanax on one day, and three weeks, I believe it said months later, you can have the seizure. Yes, Your Honor. Counsel, the Kuhn's factors include an element of reliance, do they not? That the second doctor rely on the guidance of the first doctor's orders.  Didn't Dr. Goldberg undermine that in his testimony? Didn't he testify to the effect that Dr. Gunkard did not, in fact, rely on Dr. Khalil's initial orders on that? No, the testimony is actually quite the reverse. He says Dr. Gunkard relied on Dr. Khalil's orders without deviation. How much time did Dr. K spend with the plaintiff? My recollection is he said in his testimony maybe five minutes. And how much time did Dr. G spend? Well, he spent about from March 19th through March 22nd, and I believe he saw him twice during those times. The first time, Mr. Blankworth says he saw him for maybe five, ten minutes, and the second time, Mr. Blankworth cannot remember seeing him. But I think the medical records said he did. But he was under his care at that time. Yeah, he was under his care, exactly, exactly. When Dr. K took him off of the Xanax, did the information from the emergency room identify that there had been a seizure before and when? Yes, it did identify that there was a seizure in the past, but it didn't identify what that seizure was, however. But he presented that evening, early morning, with a very high alcohol content.  And almost coma value at .244, depending upon his size. And he also had an open wound, I think, at least one, maybe two. He attempted self-harm. And they took care of the wounds, and then it's obvious, probably because of odor or otherwise, that he needs to come down from that alcohol, correct? He treated him for alcohol withdrawal. Okay. Your Honor, but some of the questions I'm beginning to sense, I just want to get us back on the Coons issue. None of those... You've never argued before us before, have you? Oh, boy. You ask a lot of questions. Well, I have a lot of answers. That does not indicate any indication, that gives you no indication of where we're going. You just ask a lot of questions. Okay, understood then. But then, proximate cause, continuing to apply the Coons factors. The record shows Dr. Ganekow in his depositions, he said he, in fact, relied on Dr. Khalil's treatment orders throughout. I hope that's an answer to one of the Justice's questions. And ultimately, Dr. Goldberg said that the CERO protocol is specifically designed to rapidly reduce benzodiazepines. And we have lots of evidence in the record showing that rapid reduction of benzodiazepines in a high-dose, long-term benzodiazepine-dependent patient spells trouble. There's a lot of danger there. So I also set forth two further theories of causation called concert of action as well as concurrent causation theory. Unless the Court has any specific questions on that, I think they're set forth with pretty good particularity in the brief. I'll move on to the settlement rule. Here the Court's construal of Illinois settlement. You can continue just to summarize that thought, and you'll have time on rebuttal. Okay, go ahead. Settlement rule. Bottom line, Your Honor, the settlement was between Dr. Ganekow for his individual capacity and the plaintiff. In no way was that in any way relevant to Dr. Khalil. At the very least, we have a question of fact as to what that settlement was. One quick question. Dr. Khalil and Dr. Gonkar, was Dr. Gankar more of a supervisor to Khalil, or were they kind of on par? You know what? I don't know exactly. The medical record doesn't specifically say it, but I will draw, make this inference, and that is that Dr. Gankar was, in fact, the owner of conventions, and he hired him.  Okay. Thank you. Thank you, Your Honor. Thank you. All right. So the first day at the Lease Council, please approach and feel free to adjust the microphone if needed. Good morning. May it please the Court. Counsel, my name is Daniel Kramer. I'm here on behalf of Dr. George. Khalil is how I believe it's pronounced, but Dr. K or Dr. Khalil is. I think that's the law of the case at this point in terms of how we pronounce it. I think maybe just to pick up where Your Honor's left off with the last question in terms of describing the relationship between Dr. Khalil and Dr. Gankar. The evidence in this case was that these two doctors were independent physicians who happened to be part of the same practice group. There was no evidence adduced in discovery to establish that there was some kind of supervisor or subordinate relationship between the two physicians. There is none. There's none. Okay. Other than, I mean, does the fact that Dr. Gankar is the owner, is the identified owner of the practice have any value here? That may be. And again, the care issue in this case arose solely at the hospital. Both doctors have independent privileges to see patients at the hospital. So I believe the record is very clear on this, that there was no relationship such that Dr. Gankar was instructing or advising Dr. Khalil in terms of how to care for this gentleman. And the situation that arose here is not unusual in that we have a patient who is clearly unstable and coming in for help through the emergency department early in the morning. And Dr. Khalil, who happens to be on call at that time, receives a phone call from a nurse asking to admit the patient. And that's a very routine operation at the hospital. In this case, as Your Honors have already noted, Dr. Khalil never physically saw this patient. His involvement was limited to taking a phone call from a nurse, receiving some information about the patient and his status, and admitting him so that he could be stabilized with the understanding that he would be seen the next day or shortly thereafter by Dr. Gankar, his practice partner. And that's exactly what occurred here. Who gave the order for the transfer to the behavioral? I believe that order was part of Dr. Khalil's admission orders collectively. So there were some orders that were processed under Dr. Khalil's name to admit the patient. And then with the knowledge that he was intoxicated and had inflicted self-harm on himself, gave the detox orders or the CEWA protocols. So the CEWA protocol, as was addressed in discovery, also covered withdrawal not just from alcohol but from benzodiazepine. But I think in terms of the summary judgment that was granted, that's really a standard of care issue that the court, I don't think, really placed much weight on, nor should they. And again, I think the basis of the court's summary judgment in this case was that the facts were such that Dr. Khalil's involvement with this patient ended after that order, and Dr. Gankar saw this patient daily, managed his medications, made all the arrangements for his discharge. And as the trial court also noted this, and I believe it was even stipulated in the plaintiff's brief in this case, the injuries for which this lawsuit was brought all occurred after the patient was discharged from the hospital. The argument that was made at the trial court was that the patient was improperly discharged from the hospital without an order for his medications to resume or for any plan to resume his medications. And so what we had was this withdrawal seizure that occurred about 24 hours after he left the hospital. Well, Dr. Khalil knew that he was on benzodiazepine as well as using alcohol, correct? I believe that's correct. I think, again, the information that he received about the patient was transmitted by phone from a nurse. But I think the understanding, as was explained in the course of discovery in the trial court, was that this patient was clearly unstable, and there were risks involved with continuing to give him high doses of Xanax in that condition. And so, you know, we obviously never got to the point where the defense experts were disclosed in this case, but that's the argument, is that you have a patient like this, it's dangerous to give them continuing their doses of Xanax. And so the reason the CEWA protocol is implemented at this point is so the patient can become stabilized, he can be monitored for any withdrawal symptoms. And I should also point out, and I think it was pointed out in the briefs, is that the patient was not completely cut off from all benzomedication. This was another point. He was put on Ativan, correct? That's correct. And that was a point that plaintiff's own expert stipulated to in his deposition, is that the patient continued to receive benzodiazepine coverage through another medication, which is essentially, well, at the time of his deposition, he said it was equivalent. And I know he tried to backtrack on that in a subsequent affidavit, which was another issue. So the argument that the patient was completely cut off from benzodiazepine is not accurate. Who put him back on the Ativan? Was that Dr. G? The Ativan was part of the CEWA protocol. From Khalil. That's correct. Okay. The discharge summary or discharge information, I don't think we actually have a copy of it in the appendix that's real easy for us to get to, but did it indicate that he should not take any of his previous medications? Or did it have any indication about his previous medications? So the facts, as I understand it, that were brought out in the testimony was that the patient had a psychiatrist who he had been seeing for many years as an outpatient. Dr. Gonkar, at the time they had contemplated discharging the patient, had a phone call or communication of some kind with Dr. Rabin, who was the outpatient psychiatrist. And the information from the patient was that he already had sufficient dosages of Xanax at home for him to resume. And the testimony in the depositions and in the trial court was that Dr. Gonkar verbally instructed the patient that he should resume the Xanax of his prior doses once he was at home. And that was a point of contention and discovery, because I believe that was not necessarily documented in the medical record, but that was Dr. Gonkar's testimony. But the discharge summary, to the best of your recollection, does not say do not take any previous medications? I think that's correct, Your Honor. And that was really the whole dispute as it related to the settling defendant, Dr. Gonkar, in terms of his communications with the patient and Dr. Rabin's documentation about the plan for the patient after he went home. Dr. Gonkar did not do a, well, did he do the recording in the records that you'd see at the end of the bed or now on a computer for this patient, or was that done at his direction through nursing or however it happened? Sure. So Your Honor makes a good point. This is going back to 2013 before we had electronic medical records for the most part. So I know that Dr. Gonkar had a typewritten initial evaluation for the patient. I believe his notes were dictated and typed after that. But he saw the patient every single day starting on the 19th all the way up through discharge. And, of course, he was being evaluated by nursing and other people. So he saw more than twice? I would presume so, yes. I mean, in terms of his documentation, I think there's probably one note daily. But, you know, as part of the CEWA protocol, the patient's being evaluated for any signs and symptoms of withdrawal, and the CEWA protocol has a score. And Dr. Goldberg, the plaintiff's expert, even conceded that, you know, those scores were normal. There was no evidence that the patient was withdrawing while he was in the hospital because he was getting appropriate coverage from the admin. Counsel, I have a question for you about the Coons factors. Counsel, the appellant has argued that there was reliance, that Dr. I believe it was Goldberg testified that, or maybe it was Dr. Gonkar testified that he had actually relied on Dr. Collier's initial orders. What's your argument as to that? Well, I think Dr. Gonkar's testimony, the reliance that he spoke of, was that he was acknowledging that his colleague had placed that order, and he saw at the time of his own evaluation no need to deviate from that plan. And I think the Coons cases we cited in our brief can be distinguished here because there was no, the court in Coons had indicated that there was a transcription error in some prescription medication that in the court's view prevented a subsequent doctor from providing appropriate treatment to the patient. And that's not the case here. Dr. Gonkar was very clear in his testimony that while he acknowledged and was relying on that order from Dr. Collier, he was making all of the independent medical decisions for this patient, and he was not using that order as a way to influence his own decision-making about what to do in the ensuing days, and certainly not at the time of discharge, which is really what the case is about. Any further? No, thank you. Thank you, Your Honor. Good morning, Your Honors. My name is Tom Lang. I represent Convention Psychiatry, and actually for a little bit of context, I also represented Dr. Gonkar for the course of the litigation and then up through the settlement. But now, obviously, with Dr. Gonkar out, we only represent conventions. Just to follow up a little bit on your question just before my co-defendant sat down about the Coons factors in that case, I think it is really important to point out that Dr. Gonkar testified that he was making his own independent decisions and determinations for treating this patient, evaluated the patient. As Your Honor pointed out, he saw him several times after that initial evaluation and was essentially managing this patient's care during the course of that hospitalization and making all the decisions. Dr. Collier was never involved after that initial admitting order, and Dr. Gonkar, by everyone's agreement, had the independent duty and ability to change orders, evaluate this patient, and make decisions as to treatment going forward. And as counsel alluded to, the main issue in this case has always been what happened at discharge. What were the orders at discharge? And that was the plaintiff's main crux of the case, is that Dr. Gonkar discharged this patient without a specific order to continue the Xanax after discharge, and he suffered a seizure about 24 hours after the discharge as a result, which is consistent with, to the extent that this is even making plaintiff's argument, is that Mr. Gonkar was receiving appropriate benzodiazepine medication during the admission. That's why he didn't have a seizure during the admission. And Dr. Goldberg essentially admits that in his deposition, tried to paper over that mistake afterwards with the affidavit, but he essentially admits that the Ativan that the patient was on effectively replaced the Xanax during the admission, and that's why you see where protocol scores were normal. That's why he didn't suffer a seizure during the admission, because he was getting the benzodiazepines that he needed because of this past history. And so that's why plaintiff's whole case has been about this discharge and Dr. Gonkar's alleged failure to have the patient resume his benzos. And that's where there would be an issue of fact, because it's a he said, she said. But that case is settled. Dr. Gonkar settled his case. All those claims based on Dr. Gonkar's conduct and the discharge have been extinguished, including claims against conventions, because those are on agency. Obviously, the claims against Dr. Khalil survive because that case was not settled. But as it pertains to conventions and any conduct by Dr. Gonkar, we would argue, and I think the court found that those are extinguished by the settlement. Because of agency. Because of agency, correct. I don't think it extends beyond that, but certainly claims based on Dr. Gonkar's conduct were settled as part of that settlement. So could conventions be found liable for Dr. Khalil's conduct? Yes, but not for anything that Dr. Gonkar did. So, counsel, your argument is that the two doctors are not acting in concert because Dr. K's involvement ended at the stage in which Dr. G took over. Correct. And that's how medicine is practiced. I mean, that's how, you know, medicine is practiced. A doctor sees a patient initially and hands them off to another physician after they're admitted for independent admission decisions and treatment plans. But if the case were you're both in the same office, and the one doctor treats him, and then he hands him off to the other doctor in the same office, how is this not a continuum affair, if you will? Well, for one thing, it's not the same office. It's a hospitalization. And so it's an admitting physician entering an admitting order and then another physician taking over. Okay, so it's at Mercy Hospital. Correct. And then he works in the ER, and then it goes over to Mercy Behavior. Correct. Does Khalil work at both the hospital? He has privileges at the hospital, but he also works at Mercy Behavior. I believe he does have privileges at Mercy Behavior, but he never saw the patient there. This isn't the type of scenario where the doctors were acting in concert, where one doctor would see him, another doctor would see him, and they had this kind of plan to continue treatment. To follow through the logical conclusion of plaintiff's argument, any physician who admitted a patient with any type of order would potentially be liable for any subsequent order during a hospitalization. I mean, look at it from the stage of an ER doc referring it to a cardiologist. Exactly. Could the ER doc, though, ostensibly be responsible for something that he failed to do that the cardiologist didn't follow up with? I don't think. I mean, if it's something that he failed to do that approximately caused the injury, perhaps. But in this case, there's an independent evaluation of Dr. Gonkar. And there probably would be an independent evaluation by a cardiologist. Correct.  And an evaluation of what it was that he did. Let's keep the hypothetical, then, in the same specialty, right? So Dr. A says, here's the initial orders. Dr. B says, I believe in Dr. A's credibility and understanding of this case, and I'm just going to go along with what he does. Is that not a question of fact? In the hypothetical, the way you're phrasing it, possibly, but that's not what occurred here. I guess that would be my argument, is that Dr. Gonkar wasn't just relying on what Dr. Khalil did. Dr. Khalil did an initial admitting order that is standard for these types of patients where he's excessively intoxicated, he has an injury, they need to detox him. There's an initial order. Any type of initial order that might be entered on a patient with the understanding that the subsequent physician is going to evaluate him and what actually needs to be done in terms of treating that detoxification. So I don't think there's no evidence in this case, there's no testimony, that Dr. Gonkar simply rubber-stamped what Dr. Khalil did. It was more of, hey, we have to triage this guy, get him an initial order to get him detoxed because he's got a .244 blood alcohol and clearly has a substance abuse problem. Let's enter that initial order, and then Dr. Gonkar makes his own assessments. Dr. Goldberg agreed with that, that Dr. Gonkar was making his own independent assessments of this. So I don't think there's a continuation. I think there's a break in the chain, so to speak. Well, I think Dr. Goldberg even says that, and maybe this was just overstating, in no way did Dr. Gonkar rely on what Dr. K had done. Right. And that's, sorry. So, I mean, he says that, and I know there's a dispute here because Dr. Gonkar didn't necessarily say that, but this is what Dr. Goldberg said. Right. And just to continue that thought and answer the question, Dr. Goldberg admitted that Gonkar wasn't relying on Khalil's evaluation. He had his own independent duty, and that was his criticism, is that he had his own independent duty, Dr. Gonkar, to evaluate this patient and institute different treatments. So to say that Gonkar was just blindly following Dr. Khalil is not inaccurate, and I wasn't implying that by Your Honor's questions, but I'm just saying that Dr. Gonkar wasn't just blindly following along. He was making his own independent assertions. I do have one. Dr. Gonkar, or counsel, I think, said, somebody said, that Dr. Gonkar testified, deposition, whatever, that he told him to resume his medication. Was that included in any of the written documents, the medical records of that discharge? No. There was not a written order telling the patient, and that was. . . Or was it just in the medical records, Mr. . . . I'm sorry, we've talked about everybody except Mr. Blanquart. Right. Was that included in the medical records generated by his stay at Mercy? Dr. Gonkar said, hey, take your meds. There was not a specific order or documentation from Dr. Gonkar that was written that said to take his meds. He did testify specifically that he told the patient to do that, but that was not, again, anything that Dr. Khalil was involved with or had any duty to follow along. And was that, this is what I do to all my patients that I discharge, or I told him to return to his regular meds? I told him. I told him specifically because he knew about this past benzoin Xanax prescription. The prescription records show that he had filled his Xanax a couple of days before this admission, so he still had almost 30 pills or so to speak. And that was one of his concerns, is that we don't want him having both the Ativan that he had in the hospital and the Xanax that he had at home because that leads to potential overdoses. And so the idea was, no, just take what you were taking before, continue with that. We bridged you in the hospital with Ativan, but going forward you have to take the Xanax that you were on before the admission. Any further questions? Thank you, Your Honor. Counsel, you may present your remote. Thank you, Your Honor. So much to do, so little time. First of all, I have to absolutely underscore for the justices, please, please go back into Dr. Goldberg's testimony. Dr. Goldberg did not say that Dr. Gunkar relied, or I should say did not rely on Dr. Khalil's SIWA orders. In fact, he says the direct opposite. He says that Dr. Gunkar followed them without deviation. Okay, I have to absolutely say that as clear as possible with all due respect. Secondly, there was this question about Dr. Gunkar believing that Mr. Blanco had some pills at home. This was thoroughly refuted. That's not really relevant here because Gunkar already settled, and maybe he settled because it wasn't documented. I don't know why he settled, but how is that even relevant to Khalil? Excuse me, which? How is it relevant whether or not he had medication at home or not? Well, these are the questions that you're asking, and I want to make sure that the Court understands that. I didn't ask him that, but I just don't understand. Okay, thank you. The general gloss that's being put on the medical records and the facts of this case is that somehow Dr. Gunkar was quite concerned about this patient's condition and had some information that he had some pills at home, and he wanted to make sure that he took some pills and had some sort of private conversation. During discovery, that was shown to be false, and I'm going to say deliberately false. We talked to Dr. Rabin's office, never got a call from Dr. Gunkar. We talked to his plaintiff, never had a conversation with Dr. Gunkar about his medications at home. So I'll leave that right there. I want to emphasize the fact that it doesn't matter how much time each doctor spent with the patient. The only thing that matters under Kuhn's is that negligent orders were issued. As long as that negligent order was issued and Dr. Gunkar followed those orders, that's enough for Kuhn's. We've raised enough factual evidence. Because what about the passage of time? I mean, that's part of the argument here is that the decisions by Dr. Kalil is on day one, but it's day whatever, 12, by the time the injury occurs. I think nothing in Kuhn's says anything about time dimension. However, from our point of view, it's common sense that if you're still following the same orders, and in fact, Kuhn's, there is a passage of time. It came from the hospital. The negligent order came from the hospital, whether mistranscribed by a nurse or some other way. Nonetheless, it came from the hospital. The doctor treated, I believe, for about four or five days. The doctor in the Kuhn's case specifically saw that the patient was having adverse effects and still kept applying the recommended treatment orders until the patient had a, I think it was a kidney damage. In this case, it's so much different and so much easier because Dr. Kalil's orders seem to be working. I know Justice Kennedy didn't like my analogy to a cardiologist, but if you had an ER doc who sees him and he maybe makes some order, and then it goes off to a cardiologist who's going to do a lot more testing and spend a lot more time with them, wouldn't it be a deviation of the standard of care for that cardiologist to rely on some ER doc's, you know, 15, 20-minute exam? Well, in the case where they're being treated separately by a separate physician under a separate, you know, separate doctor's separate profession, I'd say you bet. However, these are psychiatrists, and they're part of the same practice, and they are jointly treating him because that's part of the plan. You treat his detoxification. You get him stable as possible. I, Dr. Gankar, will then treat him the next day and do a psychiatric workup to see if I can find out why he's trying to kill himself. Uh-huh. Okay. So he kept those CEWA protocols in place. At any time, he could have reviewed it and looked at the history, but he didn't. Okay? But we're not talking about Dr. Gankar. We're talking about Dr. Kuhn. Right, but Gankar had a duty to independently make his own decisions. Exactly, and the Kuhn's case addresses that issue and rejects it thoroughly because ultimately, two, you can have more than one proximate cause for an injury. How do we know he didn't do his own evaluation and come up with the same thing? Well, even if he did, it's quite irrelevant under foreseeability analysis of the Kuhn's doctrines. All you need to do, you know, Dr. Gankar's assessment could be negligent or it could be non-negligent. All foreseeability analysis requires is that he acted in a certain way and that continued the mechanism that caused the injury. And he did. He said it. Correct. Well, he said it, but his conduct is still at issue. I mean, his conduct, it could be, you know, settled or not. And that's a great point because settling doesn't extinguish the underlying conduct. It only extinguishes the liability for the conduct. I think it's, frankly, silly to suggest that it does. And with that said, I guess my time's up. I can't go any further. Thank you. All right, thank you, counsel. Thank you. We will take this matter under advisement, issue a disposition in due course.